## CIRCUIT COURT OF THE CITY OF NORFOLK

Jake F. Friedberg

 v.

Hague Park Apartments et al.

December 3, 2001

Case No. (Chancery) C97-000

BY JUDGE CHARLES E. POSTON

This case is before the court on exceptions to the report of Commissioner in Chancery Gordon B. Tayloe.

*Facts*

Hague Park Apartments Limited Partnership ("HPALP") was formed as a limited partnership in 1966 to "hold, improve, maintain, sell (in whole or part), operate, and lease" Hague Park Apartments. Gerald Friedman and American Management Company ("AMC") served as the General Partners. Numerous other parties, including Jake Friedberg, were limited partners. Gerald Friedman, the sole owner of AMC, at some time not material to the instant litigation, assigned his partnership distributions to Nancy Friedman, his wife.

Friedman and AMC have managed Hague Park Apartments since 1979. The partnership agreement allows the general partner to serve as manager of HPALP's property and limits the management fee he may collect. No contract memorializing the terms under which Friedman was to manage the property is in evidence. In 1994 Friedman realized that he had not charged HPALP the maximum fee permitted by the partnership agreement. Without explaining his reasoning, Friedman decided to charge HPALP the maximum management fee, plus interest, for the years he had managed Hague Park Apartments.

In 1994, Friedman caused HPALP to create an account payable to him in the amount of $179,968 for past due management fees. During 1994, HPALP paid $114,658 of this amount, leaving a "balance" of $65,310. (Financial Statement, 1994.) In 1995, HPALP paid Friedman $37,914 for "past due" management fees plus $30,303 in interest on the aggregate fees.[1] (Financial Statement, 1995.) In 1996, Friedman received $27,558.38 in "past due" management fees and $35,442.62 in accrued interest, a total of $63,000. In 1997, Friedman received "past due" management fees and interest totaling $38,780.73. In 1998, Friedman collected "past due" management fees and interest totaling $36,785.77. (Exhibit 3, Tab 3.) In a related matter, Friedman borrowed $60,000 from HPALP but repaid only $52,000, plus interest thereon. He explains the $8,000 deficiency in his repayment to the collection of a "past due" management fee. This payment violated a court order issued February 10, 1998, forbidding Friedman from paying himself further "past due" management fees. To date, HPALP has paid Friedman $329,442.50 for "past due" management fees and accrued interest thereon.

On June 9, 1997, Jake Friedberg filed this suit for an accounting against Friedman and HPALP. After Jake Friedberg died, Marvin Friedberg was substituted as plaintiff in this suit in his capacity as executor of his father's estate. After Jake Friedberg's death, Friedman attempted to amend the Partnership Agreement to extend the partnership's term by twenty-five years. The then-living owners of all limited partnership interests approved this amendment. The interest owned by Jake Friedberg's estate did not participate in the decision because Marvin Friedberg was never given notice that any amendment had been proposed, nor was he asked to approve it.

---

[1] Because of the fungibility of money, it is impossible to attribute the interest that HPALP paid to "past due" management fees for a particular year.

The Court referred the case to Commissioner in Chancery Gordon B. Tayloe. After a full hearing, Commissioner Tayloe filed his report with the court July 13, 2001, to which each party has excepted.[2]

*Discussion*

## I. *Uncontested Findings*

After an independent review of the facts, the court adopts the following findings of Commissioner Tayloe to which neither side has excepted:

> 1. Friedman did not breach his fiduciary duties in causing HPALP to pay a salary to Nancy Friedman from 1983 to April 13, 2001.
> 2. Friedman did not breach his fiduciary duties in causing HPALP to pay a "finder's fee" to his son, Chip Friedman, for a loan that he negotiated on behalf of the Partnership.
> 3. Friedman's acquisition of Limited Partnership interests in HPALP did not constitute a breach of fiduciary duty.
> 4. Friedman did not self-deal by failing to collect rents for HPALP apartments occupied by other businesses he owned.

## II. *Friedberg's Motion to Strike*

Friedberg moves to strike all of Friedman's exceptions because they merely state that the Commissioner's findings are factually erroneous and contrary to law. Indeed, Friedman never attempts to explain how the Commissioner erred; he simply pleads that the Commissioner's findings were erroneous "based upon the factual record and the application of law to those facts."

Unfortunately, Virginia law does not require that exceptions to a commissioner's report be stated with specificity. The petitioner relies upon *Southern Residence Corp. v. City Supply Co., Inc.*, for the proposition that "[a]n assignment of error which merely states that the judgment or award is contrary to the law and the evidence is not sufficient." (Petitioner's Motion to Strike at 1). 160 Va. 660, 666 (1933). *Southern Residence* deals not with exceptions to a Commissioner's Report, but with appeals of circuit court decisions to the Supreme Court of Virginia. A Commissioner's Report is

---

[2] The parties did not brief their exceptions to the Commissioner's report, but rather relied upon the briefs that they had submitted to Commissioner Tayloe.

entitled to far less deference than a jury or bench verdict. The Code of Virginia states:

> The report of a Commissioner in chancery shall not have the weight given to a verdict of a jury on conflicting evidence, but the court shall confirm or reject such report in whole or in part, according to the view which it entertains of the law and the evidence.

Code of Virginia § 8.01-610.

A Commissioner's findings of fact should be adopted by the circuit court unless unsupported by the evidence. *Jamison v. Jamison*, 3 Va. App. 644 (1987). The circuit court must review the Commissioner's pure findings of law *de novo. Id.* Circuit courts have substantial discretion over the manner in which they review a Commissioner's Report, but may not simply ignore the Commissioner's findings. *Gulfstream Building Ass'n v. Britt*, 239 Va. 178 (1990).

The standards for the Circuit Court's review of a Commissioner's Report are clearly different from those governing the Supreme Court's review of a civil matter, where appeal is discretionary. A circuit court has substantial discretion to exercise its own judgment in reviewing a Commissioner's Report and indeed must exercise its own judgment over pure conclusions of law. Thus, the requirement that assignments of error be made with specificity, rooted in practice before Virginia's appellate courts, is inapplicable to the review of Commissioner's Reports.

Petitioner Friedberg also urges that *McGay v. McGay* limits circuit courts to entertaining only those objections to Commissioners' Reports that are articulated with specificity. 2000 Va. App. Lexis 628 (unpublished). Because *McGay* is an unpublished opinion, the Court will not consider any argument based upon the holding of that case. Code of Virginia § 17.1-413 states "Opinions designated by the Court of Appeals as having precedential value or as otherwise having significance for the law or legal system shall be expeditiously reported in separate Court of Appeals Reports in the same manner as the decisions and opinions of the Supreme Court." By implication, unpublished Court of Appeals opinions have no precedential effect.

The petitioner's motion to strike the respondent's exceptions to the Commissioner's Report is denied.

### III. *"Past Due" Management Fees*

The Commissioner found that Friedman had no right to pay himself "past due" management fees from HPALP funds. The respondent excepted to the Commissioner's finding without stating the grounds for his exception.

Both the petitioner and respondent dwell upon whether the statute of limitations bars Friedman's claim against the partnership for "past due" management fees. However, their fixation on whether HPALP had an affirmative defense to Friedman's hypothetical claim for past due management fees obscures the question of whether HPALP owed Friedman these fees in the first place. Because HPALP never owed Friedman any "past due" fees, Friedman had no right to cause the partnership to make such payments.

In the absence of a partnership agreement, partners are not entitled to compensation for services rendered to the partnership.[3] Thus, unless the language of the partnership agreement confers a right to "past due" management fees, no such right exists. Friedman claims that Paragraph 11(c) of the Partnership Agreement gives him that right:

> The general partners, or their agents, may provide project management, and, if so, the management fee *shall not exceed* 5% per annum, plus an amount equal to 10% of all gross receipts in excess of $183,564.00, *not to exceed* 2% of the total gross receipts. For the purposes of this paragraph, "gross receipts" is [sic] defined as gross rental income from tenants in the property, plus sales commissions.

(Emphasis supplied.) Friedman contends that, because he had not collected the maximum permissible management fee from the partnership for the years

---

[3] "A partner is not entitled to remuneration for services performed for the partnership, except for reasonable compensation for winding up the business of a partnership." Code of Virginia, § 50-73.99(H). This provision, while part of the Virginia Revised Uniform Partnership Act (VRUPA) and not the Virginia Revised Uniform Limited Partnership Act (VRULPA), is applicable to the general partners of limited partnerships. VRULPA states "Except as provided in [VRULPA] or the partnership agreement, a general partner of a limited partnership has the same rights and powers as a partner of a partnership without limited partners." Code § 50-73.29(A). Since no provision of VRULPA supercedes Code § 50-73.99(H), this provision constitutes the default rule for limited partnerships and applies unless trumped by an inconsistent provision in a limited partnership agreement.

between 1979 and 1993, he was entitled to reopen the books for those years and retroactively award himself such a fee, with interest.

Friedman's argument flies in the face of the express language of the partnership agreement. Paragraph 11(c) of the Partnership Agreement never specifies the management fee to which the general partner is entitled; rather, it places an outer limit upon the fee that he may collect. This paragraph serves two purposes:

1. It specifies that the general partner may receive a fee for acting as property manager, thus waiving the default rule forbidding a general partner from receiving compensation for services rendered to the partnership. .

2. To prevent abuse by the general partner, paragraph 11(c) restricts the management fee the general partner may receive.

Friedman's claim that paragraph 11(c) gives him a right to collect the maximum fee is without foundation. Had the partners desired to guarantee the general partner a given fee, they easily could have chosen unambiguous language doing just that. The absence of such language compels the conclusion that paragraph 11(c) was intended *to limit* and not to specify the fee the general partner could charge.

In determining who should manage the property and what fee this person would receive, Friedman was bound by the fiduciary duties of loyalty and care. The fiduciary duty of loyalty forbids a partner from "dealing with the partnership in the conduct or winding up of the partnership business as or on behalf of a party having an interest adverse to the partnership." Code of Virginia, § 50-73.102(B)(2).[4] Thus, Friedman was legally bound to steer clear of any self-dealing in which his personal interests were adverse to those of the partnership. If Friedman caused HPALP to enter into a transaction with himself when his interests were adverse to those of the partnership, he would have been dealing with the partnership on behalf of a party (i.e., himself) having an interest adverse to the partnership. This would constitute a clear violation of his duty of loyalty.

In the absence of a contract with HPALP, Friedman's only basis for recovering management fees is on a theory of *quantum meruit* or quasi-

---

[4] Though not part of VRULPA, Code § 50-73.102(B)(2) is applicable to the general partners of limited partnerships. VRULPA states, "Except as provided elsewhere in [VRULPA], a general partner of a limited partnership had the liabilities of partners in a partnership without limited partners." Code § 50-73.29(B). Since no portion of VRULPA supercedes the enumeration of a partner's fiduciary duties contained in VRUPA, a general partner of a limited partnership is subject to the fiduciary duties specified in Code § 50-73.102(B)(2).

contract.[5] Such a theory would allow him to recover the reasonable value of services actually rendered, if he had a reasonable expectation of receiving payment. The record, though, indicates that Friedman had already received reasonable payment for his services before he collected a single cent of "past due" management fees. Not only did Friedman acquiesce to the fees he received for fourteen years, he determined the fees himself. (Commissioner's Report, 7.) This arrangement might itself have been a violation of Friedman's fiduciary duty of loyalty.[6] Furthermore, a person who is not receiving reasonable payment for his services is unlikely to remain in a position for fourteen years. Had Friedman's services been worth more than the compensation he originally received from HPALP, he could have relinquished his management position. It is difficult for Friedman to argue with credibility that he had underpaid himself for fourteen years when during those fourteen years he did not complain.

Because Friedman was collecting monies to which he was not entitled, his interests were clearly adverse to those of HPALP. Every dollar of the excess management fees and interest Friedman took was one less dollar for HPALP to distribute to its partners. Thus, in paying himself management fees to which he had no legal right, Friedman breached his fiduciary duty of loyalty.

While this conclusion is merited by the statutory duty of loyalty standing alone, it is bolstered by paragraph 9 of the Partnership Agreement:

> The books shall be closed and balanced at the end of each fiscal year and audited by the accountant regularly servicing the partnership. The General Partners agree to deliver to the Limited Partners, within ninety (90) days after the expiration of

---

[5] Friedman never argues either of these theories of recovery, but rather seems to believe he is due past due management fees because of the language of the partnership agreement. As previously discussed, this argument is without merit.

[6] Friedman would have violated his duty of loyalty if he paid himself more than the commercially reasonable value of his services. If Friedman had "negotiated" to pay himself more than the prevailing rate for management services of comparable quality, he would have received a windfall while HPALP would have suffered an unnecessary expense. HPALP would have every interest in ending this state of affairs, while Friedman would want to preserve it for as long as possible. The interests of HPALP and Friedman would be adverse. Thus, if Friedman collected management fees in excess of what was commercially reasonable, he violated his fiduciary duty of care by transacting business with HPALP when his personal interests were adverse to those of the partnership.

each fiscal year of the Partnership, a balance sheet and profit
and loss statement prepared by the partnership's accountant,
together with statements showing the capital account of each
Partner, the distributions to each Partner and the amount thereof
reportable for state and federal tax purposes.

Allowing the general partner to re-open the books after the expiration of a
fiscal year would reduce this carefully chosen language to mere surplusage.
Friedman claims he re-opened the books only to correct an error, but he never
explains why paying himself less in management fees than the maximum
permitted by the partnership agreement was an error. Presumably, the fact that
he was willing to accept these lower fees for fourteen years shows the payment
of less than the maximum was nothing other than sound business practice. In
the absence of a compelling showing that there was an error to correct,
Friedman could not re-open the books and thereby subvert the limited
partners' reasonable expectation that the annual statements they had received
represented the true condition of the partnership. Because Friedman is not
entitled to past due management fees, he obviously has no right to interest
thereon.

The Court concludes that Friedman must reimburse all past due
management fees and interest thereon for the period 1979 to 1993 paid to
himself by the partnership. Specifically, the Court finds that Friedman is
indebted to HPALP in the sum of $329,442.50 with interest thereon from June
9, 1997, the date the suit was filed.

## IV. *Extension of the Partnership Term*

The Commissioner found that HPALP had adopted an amendment to
its Partnership Agreement that extended the partnership term by twenty-five
years. Petitioner Friedberg takes exception to this finding, though the precise
basis for his objection is unclear. For the reasons discussed *infra*, the Court
overrules the Commissioner's finding and holds that the Amendment to the
Partnership Agreement purporting to extend the term of the Partnership by
twenty-five years was not validly adopted.

The question of whether Friedman's effort to extend the term of the
Partnership Agreement was effective is intertwined with the question of
whether Marvin Friedberg acquired the powers of a limited partner in HPALP
when he became executor of the estate of Jake Friedberg. After Jake
Friedberg's death, Friedman promulgated an amendment to the Partnership
Agreement that, if approved, would have extended the term of the partnership

by twenty-five years. Marvin Friedberg, executor of Jake Friedberg's estate, was never given notice of this Amendment nor asked to approve it. The Partnership Agreement could be amended only with the unanimous consent of the limited partners. Since Marvin Friedberg, as executor, never consented to the amendment of the Agreement, if he had the powers of a limited partner at the time of the amendment's adoption, the amendment would be a nullity.

The Commissioner opined "without enthusiasm" that the amendment was effective because, under his interpretation of Virginia law, "all partners," limited and general, had approved the amendment. Certainly, if Jake Friedberg had acquired the powers of a limited partner, the Commissioner's conclusion cannot stand. The Commissioner found that Marvin Friedberg had not become a limited partner because the rights conferred to a personal representative upon the death of his principal are restricted to "any power the partner had to give an assignee the right to become a limited partner." Because the Partnership Agreement allows the assignment of a limited partner's interests only with the consent of the general partner, the Commissioner concluded that Marvin Friedberg never assumed the powers as limited partner that Jake Friedberg had previously held.

The Commissioner's conclusion rests upon a mistaken interpretation of Code of Virginia § 50-73.48. This relevant portion of this section reads:

> If a partner who is an individual dies . . . the partner's executor . . . may exercise all the partner's rights for the purpose of settling his estate or administering his property including any power the partner had to give an assignee the right to become a limited partner.

The import of this provision is clear. Upon qualification, the executor of a deceased limited partner assumes *all* powers previously held by the limited partner and may exercise these powers throughout the period of administration, for the purpose of *settling the estate*. The language conferring upon the executor the power to give assignees the right to become a limited partner is inclusive, not exclusive. This language clarifies the fact that an executor may, if the partnership agreement permits, execute an assignment of the limited partnership interest to a beneficiary of the deceased limited partner's estate. However, this language in no way circumscribes the power of the executor to exercise all powers previously held by the deceased limited partner.

The only limit upon the executor's assumption of the powers of a limited partner is that they must be exercised for the purpose of settling the

decedent's estate or "administering his property." Marvin Friedberg was well within these boundaries in opposing the proposed twenty-five-year extension of the limited partnership term. One of the foremost duties of an executor is to preserve the value of estate property during administration. Friedman's continued invasion of HPALP's assets gave Marvin Friedberg every reason to believe that no investment controlled by Gerald Friedman was safe. For this reason alone, opposing Friedman's attempt to extend the partnership term was necessary to administering estate property.

Marvin Friedberg acquired the powers of a limited partner upon qualifying as his father's executor; thereafter, any amendment to the Partnership Agreement required his approval. To hold otherwise would be to place a decedent's entire investment in the hands of the surviving partners without any recourse available to the decedent's survivors. Because Friedman never obtained or even sought Marvin Friedberg's approval, the proposed Second Amendment to the partnership agreement is invalid.

### V. Payment of Friedman's Personal Health Insurance Premiums with HPALP Funds

Friedman excepts to the Commissioner's finding that he violated his fiduciary duties to HPALP by causing it to pay the cost of his personal health insurance. The Commissioner's finding is amply supported by the facts and the law. The record contains a letter from Trigon documenting the premiums paid by HPALP on behalf of Gerald Friedman. The partnership's one time accountant, Cohen, testified that he told Friedman the payment of personal health insurance premiums from partnership funds was inappropriate. (Deposition of Cohen, p. 37.)

As already discussed, a general partner owes fiduciary duties of loyalty and care to the partnership. The duty of loyalty requires that the fiduciary not engage in any self-dealing when his interests are adverse to those of the partnership. Paying for his personal health insurance out of partnership funds is a classic case of such a self-interested transaction. Each dollar devoted to paying Friedman's health insurance was one dollar less for HPALP to distribute to its partners. Since Friedman performed no services in exchange for the payment of his insurance, HPALP received no benefit that could have offset its outlay.

The Court will require Friedman to reimburse the partnership for the payment of his personal health insurance premiums of $16,257, with interest thereon from June 9, 1997.

## VI. *Personal Loan of HPALP Funds*

### A. *The $60,000 Loan*

The Commissioner found that Friedman violated his fiduciary duties by making a personal loan to himself of HPALP funds. Friedman admits that he wrote a $60,000 check to himself on HPALP's account, but claims that $8,000 of this amount was reimbursement for past due management fees. The limited partners never authorized this loan. Friedman subsequently repaid the partnership the "principal" amount of $52,000, plus interest thereon at the rate of 8.75% per annum.

Because Friedman has no basis for collecting past due management fees, this transaction was effectively an uncollateralized loan of $60,000 from HPALP to Friedman. This loan constitutes self-dealing of the most obvious kind, and Friedman never contends that this loan was in the interest of the partnership. Friedman makes no exceptions to the Commissioner's findings with regard to the $60,000 loan,[7] and the court adopts the Commissioner's finding that Friedman's borrowing HPALP funds for personal use constituted self-dealing and a breach of his fiduciary duties.

### B. *The $895 Loan*

The Commissioner also found that Friedman had failed to prove by clear and convincing evidence that an $895 check drawn on the account of Nancy Friedman was not in repayment of a loan made by the partnership. Friedman excepts to this finding without explanation.

The record contains a check stub dated September 4, 1997. (Attachment to Petitioner's Memorandum of Law.) The check is from Nancy Friedman payable to Hague Park Apartments and contains the notation "repay loan to Nancy Friedman." Even if the burden of proof were not upon

---

[7] Of course, Friedman does claim entitlement to past due management fees and thus would presumably dispute the Commissioner's finding that repaying $52,000 plus interest left him $8,000 in debt to HPALP. Since the court has determined that Friedman had no basis for collecting past due management fees, he must repay the $8,000 he applied towards these fees, plus interest thereon. The $8,000 in dispute is included in the earlier computation of "past due" management fees that Friedman must disgorge. This payment constituted a violation of this court's order of February 10, 1998, which forbade Friedman from paying himself further "past due" management fees.

Friedman, this evidence would support a finding that HPALP had made an $895 loan to Friedman's wife, Nancy Friedman. Because Friedman never addressed this check in his memorandum of law, there is simply nothing to rebut the finding that HPALP made a personal loan of $895 to Nancy Friedman. Furthermore, since Friedman carries the burden of proof, he cannot prevail on this issue without explaining the check stub. He has made no such explanation, and the court sustains the Commissioner's finding that the $895 check from Nancy Friedman was in repayment of a personal loan made to Friedman by HPALP. In causing HPALP to make such a loan to his wife, Friedman violated the fiduciary duties he owed to HPALP.

### VII. *Friedman's Acquisition of Limited Partnership Interests*

The Commissioner also found that Friedman did not violate his fiduciary duties in acquiring limited partnership interests without notifying Friedberg, and Friedberg takes exception to this finding. Since both sides agree that Friedman acquired such limited partnership interests, this dispute is purely legal.

All partnership interests are freely assignable unless the partnership agreement provides otherwise. Code of Virginia § 50-73.45. The Code never requires a party acquiring limited partnership interests to give notice to other partners not involved in the transaction, nor does Friedberg cite any authority that would impose such a requirement. Friedberg's sole objection seems to be that Friedman will use the voting power conferred by such interests to consolidate his control over the partnership. However, Virginia law simply provides no protection against such a threat. Any investor in a limited partnership assumes the risk that hostile parties might acquire a controlling interest in the partnership. The exception, then, is overruled.

### VIII. *Investment of Partnership Funds in PaineWebber Account*

The Commissioner found that Friedman's investment of Partnership funds in a PaineWebber brokerage account was a technical violation of the Partnership Agreement. Friedman objects to this finding without explanation.

Friedman never challenges Friedberg's allegation that HPALP funds were invested in a PaineWebber account and argues only that the account was not a margin account and that these investments caused no loss to the partnership. (Respondents' Memorandum of Law, pp. 11-12.)

Thus, the only question is whether these actions violated Friedman's fiduciary duties. Paragraph 8 of the Partnership Agreement provides:

> The General Partners shall open and maintain . . . a separate bank account in the name of Hague Park Apartments, in which shall be deposited *all* of the monies of the partnership and no other monies. The funds shall be used solely for the business of the partnership, and all withdrawals therefrom are to be made upon checks signed by the General Partners or their agent.

(Emphasis supplied.)

While the record shows that the HPALP funds in the PaineWebber account were invested in conservative securities (Tr. 370-80), the fact remains that the Partnership Agreement required Friedman to place partnership funds in a bank and did not permit him to invest the funds in a brokerage account. That the investments were conservative and caused no loss to the partnership argues against imposing severe sanctions for this particular breach, but it in no way justifies Friedman's violation of the Partnership Agreement. The court sustains the Commissioner's finding that Friedman committed a technical violation of the Partnership Agreement.

## IX. *Sanctions*

The Commissioner recommended that, in addition to reimbursing HPALP for all "past due management fees," the court impose the following sanctions upon Friedman.[8]

1. Payment of 50% of Friedberg's total legal expenses;

2. Reimburse HPALP for 50% of its legal expenses[9] in defending this matter;

3. Pay the Commissioner in chancery for fees and costs;

4. Render an accounting of partnership activities to Friedberg for the next three years.

---

[8] Neither the petitioner, the respondent, nor the Commissioner state the legal authority upon which sanctions are based, but all three seem to believe that the court has discretion to impose the sanctions discussed in this memorandum if it deems such sanctions appropriate.

[9] Under the terms of the Partnership Agreement, the General Partner may hire "accredited persons," including attorneys to assist the operation and management of HPALP's property. Partnership Agreement paragraph 11(a)(ii). Since HPALP is a named defendant in this litigation, Friedman has used this power to hire an attorney to defend himself and the partnership.

Friedman excepts Commissioner's recommendations (1) and (2) and argues that he should not be required to reimburse Friedberg's or HPALP's legal expenses.

Friedberg also takes exception to the Commissioner's recommendations. Friedberg asks that, in addition to sanctions (3) and (4), Friedman should:

1. Be stripped of all management authority in HPALP;

2. Reimburse Friedberg for all legal expenses in pursuing this matter;

3. Reimburse HPALP for all legal expenses in defending this matter.

Friedman engaged in serious, flagrant, and repeated breaches of his fiduciary duties. He used the claim of "past-due management fees" as a basis for moving money from HPALP's coffers into his own pockets. Given Friedman's unwillingness to abide even by judicial decrees, he simply cannot be trusted to conduct the affairs of the partnership without supervision by the court. The Court will require Friedman to file quarterly accountings before the Commissioner in Chancery who shall report thereon to the Court. Any costs incurred incident to those filings shall be paid by Friedman personally.

This suit and the expense it has occasioned would have been completely unnecessary but for Friedman's violations of his fiduciary duties to the limited partnership. Friedberg has been forced to sue in order to defend his investment in HPALP against Friedman's actions. HPALP, the daily affairs of which are in Friedman's hands, has been forced to spend thousands defending its general partner. The Court holds Friedman must reimburse HPALP and Friedberg for all legal expenses they have incurred in this cause, including the Commissioner's fees and taxable costs.

*Summary*

For the foregoing reasons the Court holds:

1. That Friedman reimburse the past due management fees that he collected in violation of his fiduciary duties. Specifically, Friedman should pay HPALP $329,442.50 with interest thereon from June 9, 1997, the date this suit was filed.

2. That the Second Amendment to the Partnership Agreement under which the term of the Partnership would have been extended by twenty-five years is a nullity.

3. That Friedman reimburse HPALP for the cost of his personal health insurance in the amount of $16,257 with interest thereon from June 9, 1997.

4. That, because of Friedman's repeated breaches of his fiduciary duties, the Court requires (a) that he reimburse HPALP for all legal expenses,

including reasonable attorney's fees, that it incurred in defending the present suit; (b) that he reimburse Friedberg's estate for all legal expenses, including reasonable attorney's fees incurred in bringing the present action; (c) that he pay all of the Commissioner's fees and costs arising from this suit; (d) that he file quarterly accountings with the Commissioner in Chancery who shall report to the Court thereon; and (e) that the fees of the Commissioner in Chancery be paid by Friedman and not by HPALP.